**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ANTHONY JACOBS,**

                                        **Petitioner,**

                        **v.**                                          **9:09-cv-958**
                                                                        **(MAD)**
**DALE ARTUS,**

                                        **Respondent.**
_____


**APPEARANCES:**                          **OF COUNSEL:**

**ANTHONY JACOBS**
**05-A-2059**
Attica Correctional Facility
Box 149
Attica, New York 14011
Petitioner *pro se*

**OFFICE OF THE NEW YORK**              **LEILANI J. RODRIGUEZ, AAG**
**STATE ATTORNEY GENERAL**
120 Broadway
New York, New York 10271
Attorneys for respondent


**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

    On February 17, 2005, after a three-day trial, an Ulster County jury found petitioner guilty

of Rape in the First Degree, Burglary in the Second Degree, and Attempted Criminal Sexual Act

in the First Degree.  On April 15, 2005, the county court sentenced petitioner to a determinate

term of twenty-five years' imprisonment, to be followed by five-years' post-release supervision, on

the rape conviction, and determinate terms of fifteen-years' imprisonment for both the attempted criminal sexual act and the second-degree burglary convictions.

Currently before the Court is petitioner's habeas corpus petition in which he asserts that his state-court conviction was the product of various constitutional violations.

## II. BACKGROUND

A.    **The People's case**

In the early hours of July 7, 2004, 84-year-old E.M.[1] was asleep in her bed in her home at 18 North Manheim Boulevard, New Paltz, New York.  She was awakened by petitioner, who was rubbing her face and telling her, "it's all right, nobody knows I am here, but while I am here, I am only going to be here for a little while, and we'll have fun."  Petitioner also told E.M. that he would be coming back from time to time.  *See* Trial Transcript ("Tr.") at 186-191.  E.M. tried to ask petitioner questions to find out who he was and what he wanted, but petitioner did not answer. Petitioner, who was not wearing pants, got on top of E.M. and E.M. grabbed his penis to prevent him from penetrating her vagina.  At that point, E.M. "blanked out" and could not remember what happened or whether penetration had occurred.  *See id.* at 192-94.  E.M. next remembered telling petitioner that she had to use the bathroom.  Petitioner got annoyed, but allowed E.M. to use a restroom that was nearby.  Petitioner held E.M.'s arm while she used the restroom and, when she finished, put her back in the bed and got on top of her again.  *See id.* at 193-94.  Thereafter, petitioner brought his penis close to E.M.'s mouth, but again, E.M. "blanked out" and could not recall what happened or if he actually put his penis in her mouth.  *See id.* at 197, 199.  Petitioner

---

[1] In accordance with New York Civil Rights Law § 50-b, the Court has abbreviated the names of the alleged victim and all relevant family members.

then got up and put his pants on and walked out of the bedroom, across the living room, and out the front door. *See id.* at 199-200.

After petitioner left, E.M. called 911 and her daughter, S.P. Shortly thereafter, the police and S.P. arrived at E.M.'s house and E.M. was taken to Benedictine Hospital. *See id.* at 202-03. After the attack, E.M. experienced soreness in her vagina that she had not felt before her encounter with petitioner. *See id.* at 203-05.

Jenifer Nerone, a registered nurse and sexual assault nurse examiner, met with E.M. at approximately 10:00 a.m. on July 7, 2004, at Benedictine Hospital. *See id.* at 449-50, 457. Ms. Nerone performed a pelvic exam and collected specimens for the sexual assault kit. She also took photographs of E.M.'s injuries. *See id.* at 460-63. At first E.M. was composed and quiet, but as Ms. Nerone counseled E.M. on HIV and other various sexual transmitted diseases, she began to cry. *See id.* at 463. During the examination, Ms. Nerone observed a vaginal tear that was bleeding and an abrasion that was draining blood that was about one inch inside of E.M.'s vagina. *See id.* at 464-66. In Ms. Nerone's opinion, the injuries were consistent with "some sort of penetration." *See id.* at 474.

As part of the examination, Ms. Nerone asked E.M. questions and recorded the answers.[2] The form on which Ms. Nerone recorded E.M.'s answers indicated that E.M. affirmatively answered questions with respect to whether petitioner had penetrated her vagina with his penis, and whether there was "oral touching of [the] genitals of the assailant by [E.M.]." *See id.* at 481. E.M. told Ms. Nerone that petitioner took his pants off, pushed her nightgown up and rubbed against her. E.M. further stated that petitioner kept putting her hands "down there" to guide him

---

[2] At trial, Ms. Nerone read to the jury the form on which she recorded E.M.'s responses during the examination. *See* Tr. at 480-83.

and that he tried to put his penis in her mouth.  *See id.* at 487.  E.M. told Ms. Nerone that

petitioner kept trying to kiss her on her chest, neck, and face.  *See id.*

Robert Knoth, a police officer with the Town of New Paltz Police Department, and his

canine partner Zeus, arrived at E.M.'s home on July 7, 2004.  Zeus was able to pick up petitioner's

scent and tracked him to a parked van several blocks away from E.M.'s home.  *See id.* at 326-32.

State Troopers Mario Restivo and Dina Pavloudakis approached the van and saw a foot in the

window.  Trooper Restivo knocked on the window and saw petitioner inside.  *See id.* at 336, 340.

Petitioner opened the door and Trooper Restivo observed that petitioner was wearing tan shorts

and fit the description of the perpetrator.  Inside the van was a makeshift bed.  Petitioner was

barefoot and the sneakers in the van were wet, as if petitioner had just walked on wet grass.

Petitioner smelled of alcohol and body odor.  *See id.* at 341-44.

Detective Robert Luchessi of the Town of New Paltz Police Department, was called to

respond to E.M.'s house on July 7, 2004, and, while there, observed that one of the window

screens had been cut and that there were scuff marks on the wall.  *See id.* at 418-22.  Detective

Luchessi collected evidence at the scene, including the screen, bed sheets, and E.M.'s night gown.

*See id.* at 422-27.

Nichole Shear, a serologist for the New York State Police Forensic Investigation Center,

prepared samples of the collected evidence to be tested for DNA.  *See id.* at 263-82.  Dr. Russell

Gettig, a forensic scientist with the New York State Police lab, tested several samples from

petitioner's and E.M.'s clothing worn during the attack, the sexual assault kit obtained from the

hospital, and from the sheets on E.M.'s bed.  After comparing the DNA to samples taken from

petitioner after his arrest, Dr. Gettig concluded that petitioner's blood was found on E.M.'s bed

sheet.  *See id.* at 292, 308.  Dr. Gettig also found a mixture of E.M.'s and petitioner's DNA on

petitioner's shorts.  *See id.* at 312-13.  However, petitioner's DNA was not found on the vaginal swab taken during E.M.'s physical examination.  *See id.* at 322.

Several weeks prior to July 7, 2004, E.M.'s neighbor, Celeste Cleary, saw petitioner walking across her back yard toward E.M.'s house.  During that period, she also noticed a large van parked on the street at night near her and E.M.'s house.  *See id.* at 246-51.

**B.     Petitioner's case**

Petitioner testified that on July 6, 2004, he was with his girlfriend, Guenevere Bostwick ("Guen"), in New Paltz, New York, and that they had gotten into an argument.  *See id.* at 537-38.  After the argument, Ms. Bostwick and petitioner parted on bad terms.  *See id.* at 538.  Petitioner decided that he was going to start drinking at around 10:30 or 11:00 p.m.  Petitioner, who was with a friend named Craig, went to a local bar and consumed approximately eight to twelve drinks.  *See id.* at 539.  Thereafter, petitioner met with another friend named Syd, who asked petitioner if he wanted to smoke marijuana.  Syd told petitioner that the marijuana contained angel dust.  Petitioner went with Syd to a nearby bench where they smoked "two joints" laced with angel dust.  *See id.* at 540-41.  Petitioner then went to another bar about a block away and consumed three-to-four additional drinks.  *See id.* at 542-43.

At around 5:00 a.m., petitioner and his friend Craig went to petitioner's car to sleep.  Petitioner left Craig in the car and went to a deli to buy some water.  *See id.* at 544-45.  Thereafter, petitioner decided to walk to Ms. Bostwick's house, which was located across the street from E.M.'s house.  Petitioner thought that he saw his girlfriend and followed her to E.M.'s house.  He called "Guen" three or four times, but received no answer.  *See id.* at 546-47.  Petitioner attempted to enter through the front door, but it was locked.  Petitioner went to a

window in the back and again called for Guen, but again received no answer and assumed that she was hiding from him.  *See id.* at 548-49.  Thereafter, petitioner used a folding pocket knife to cut the screen, went in through the window, and again called for Guen.  *See id.* at 550, 566-67.

When he received no answer, petitioner went to the bedroom and thought he saw Guen in the bed.  *See id.* at 550-51.  He caressed her hair and told her that he was sorry.  The person in the bed awoke and petitioner took off his pants and asked her if he could get into the bed.  *See id.* The person in the bed grabbed petitioner's penis and moved over to make room for him.  *See id.* Petitioner got in the bed next to her and kissed her face and lips.  *See id.* at 550-52.  The minute petitioner kissed her he knew that she was not Guen and was shocked.  *See id.* at 552.  At that point, petitioner got up, put his pants back on, and left.  *See id.* at 552.  Petitioner went to his van, which was parked about 200 feet from E.M.'s house, and fell asleep.  *See id.* at 553-54.  The next thing petitioner remembered was waking up surrounded by State Troopers.  Petitioner denied putting his penis near E.M.'s mouth or vagina.  *See id.* at 554-55.

## C.    The People's rebuttal case

Guenevere Bostwick testified that, at the time of the crime, she lived at 17 North Manheim Boulevard in an upstairs apartment.  Ms. Bostwick also testified that she was thirty-three years old, 5'4" tall, weighed about 130 pounds, and that petitioner was her ex-boyfriend.  *See id.* at 613-14.

## D.    Verdict and sentence

On February 17, 2005, petitioner was found guilty of Rape in the First Degree, Burglary in the Second Degree, and Attempted Criminal Sexual Act in the First Degree, but was acquitted of

Criminal Sexual Act in the First Degree. *See id.* at 757-58. On April 15, 2005, the county court sentenced petitioner to a determinate term of twenty-five years' imprisonment on the rape conviction, and determinate terms of fifteen-years' imprisonment for both the attempted criminal sexual act and the second-degree burglary convictions. Petitioner's sentence was to be followed by five-years' post-release supervision.

**E.    Petitioner's direct appeal**

Petitioner's attorney on direct appeal, Kiley D. Scott, Esq., argued to the Appellate Division, Third Department, that (1) the verdict was not supported by legally sufficient evidence and that the rape conviction was contrary to the weight of the evidence; (2) the prosecution elicited a statement at trial that it had failed to turn over to the defense; and (3) the sentence was harsh and excessive. *See* Dkt. No. 9 at Exhibit "A." Petitioner submitted a *pro se* supplemental brief claiming that (1) the sentence violated his right to due process because the prosecutor failed to establish that petitioner was a second felony offender, and (2) the court improperly sealed the pre-sentence report. *See id.* at Exhibit "B." The People submitted a brief responding to all of petitioner's claims. *See id.* at Exhibit "C."

In a decision dated February 1, 2007, the Appellate Division, Third Department, unanimously affirmed petitioner's conviction. *See People v. Jacobs*, 37 A.D.3d 868 (3d Dep't 2007). Citing E.M.'s testimony, as well as the sexual assault medical examination and the fact that biological fluid on petitioner's shorts and on E.M.'s bed was tested and determined to contain DNA from both himself and E.M., the appellate division held that "there was indeed a valid line of reasoning and permissible inferences which could lead to the conclusion reached by the jury, namely, that [petitioner] raped the victim that morning . . . and also intended to place his penis

into her mouth and came dangerously close to doing so. . . ." *Id.* at 869-70 (internal citations omitted). The court found that even though "the elderly victim candidly testified that she 'blanked out' during certain portions of the assault[,]" her testimony established that petitioner's "exposed penis was 'in the area of' her vagina as he lay on top of her, that she tried to prevent it from entering her and that she then 'blocked everything out.'" *Id.* at 869. The court further found that E.M.'s testimony established that petitioner's "penis was thereafter near her mouth as he 'went up higher on [her],' at which point she 'went blank again;'" and, although E.M. did not recall actual penetration, the court relied on her testimony that "she was sore in her 'private area' following the attack." *Id.* Next, regarding petitioner's burglary conviction, the court opined that petitioner's "intent to commit a crime could be inferred from the manner of defendant's entry into the victim's home, with the jury obviously rejecting the implausible explanation offered by [petitioner]." *Id.* at 870 (citations omitted). Finally, the court found that the trial court did not abuse its discretion in denying petitioner's motion for a mistrial "inasmuch as the court's prompt, curative instruction for the jury to disregard testimony pertaining to an undisclosed inculpatory statement by [petitioner] was sufficient to alleviate any prejudice to him, particularly in the absence of willful misconduct by the People." *Id.* (citations omitted).

**F.     Petitioner's motion to vacate the judgment**

On June 30, 2008, petitioner filed a motion to vacate his conviction with the Ulster County Court. *See id.* at Exhibit "H."[3] Petitioner argued that he received ineffective assistance of trial counsel in that his attorney failed to consult with a medical expert to controvert the testimony of

---

[3] Although petitioner's motion to vacate his conviction was filed on June 30, 2008, the motion papers were dated March 28, 2008. *See* Dkt. No. 9 at Exhibit "H."

the prosecution's expert, Jenifer Nerone, R.N.  *See id.*  The People opposed the motion, arguing that the ineffective assistance of counsel claim was procedurally barred because it could have been raised on direct appeal.  *See id.* at Exhibit "I."

On July 22, 2008, the court denied petitioner's motion pursuant to New York Criminal Procedure Law § 440.10(2)(c), finding that there were sufficient facts to raise the claim on direct appeal and that petitioner unjustifiably failed to do so.  *See id.* at Exhibit "K."  On September 23, 2008, the appellate division denied petitioner's application for leave to appeal the denial of his motion to vacate.  *See id.* at Exhibit "N."

**G.    Petitioner's writ of error coram nobis**

On October 23, 2008, petitioner filed a petition for a writ of error coram nobis in the Appellate Division, Third Department, alleging that he was denied the effective assistance of counsel due to his appellate counsel's failure to argue that his trial counsel was ineffective for failing to (1) impeach E.M.'s testimony with the 911 call in which she stated that she was not raped and (2) consult a medical expert.  *See id.* at Exhibit "O."  On December 5, 2008, the appellate division denied petitioner's application, *see id.* at Exhibit "R," and, on February 26, 2009, the New York State Court of Appeals denied petitioner's request for leave to appeal, *see id.* at Exhibit "U."

**III. DISCUSSION**

**A.    Standard of review**

The enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA") brought about significant new limitations on the power of a federal court to grant habeas relief to a state

prisoner under 28 U.S.C. § 2254. In discussing this deferential standard, the Second Circuit noted

in *Rodriguez v. Miller*, 439 F.3d 68 (2d Cir. 2006), *cert. granted, judgment vacated and case*

*remanded on other grounds by* 549 U.S. 1163 (2007), that

> a federal court may award habeas corpus relief with respect to a
> claim adjudicated on the merits in state court only if the
> adjudication resulted in an outcome that: (1) was "contrary to, or
> involved an unreasonable application of, clearly established Federal
> law, as determined by the Supreme Court of the United States"; or
> (2) was "based on an unreasonable determination of the facts in
> light of the evidence presented in the State court proceeding."

*Id.* at 73 (quoting 28 U.S.C. § 2254(d)) (footnote omitted); *see also DeBerry v. Portuondo*, 403

F.3d 57, 66 (2d Cir. 2005) (quotation omitted); *Miranda v. Bennett*, 322 F.3d 171, 178 (2d Cir.

2003) (quotation omitted).

     In providing guidance concerning the application of this test, the Second Circuit has

observed that

> a state court's decision is "contrary to" clearly established federal
> law if it contradicts Supreme Court precedent on the application of a
> legal rule, or addresses a set of facts "materially indistinguishable"
> from a Supreme Court decision but nevertheless comes to a
> different conclusion than the Court did. [*Williams v. Taylor*, 529
> U.S. 362] at 405-06, 120 S. Ct. 1495 [(2000)]; *Loliscio v. Goord*,
> 263 F.3d 178, 184 (2d Cir. 2001) . . . . [A] state court's decision is
> an "unreasonable application of" clearly established federal law if
> the state court "identifies the correct governing legal principle from
> [the Supreme] Court's decisions but unreasonably applies that
> principle to the facts" of the case before it. *Williams*, 529 U.S. at
> 413, 120 S. Ct. 1495.

*Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007); *see also Williams v. Artuz*, 237 F.3d

147, 152 (2d Cir. 2001) (citing *Francis S. v. Stone*, 221 F.3d 100, 108-09 (2d Cir. 2000)).

     Significantly, a federal court engaged in habeas review is not charged with determining

whether the state court's determination was merely incorrect or erroneous, but instead whether

such determination was "objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409

(2000); *see also Sellan v. Kuhlman*, 261 F.3d 303, 315 (2d Cir. 2001) (citation omitted).  Courts

have interpreted "objectively unreasonable" in this context to mean that "'some increment of

incorrectness beyond error'" is required for the habeas court to grant the application. *Earley v.

Murray*, 451 F.3d 71, 74 (2d Cir. 2006) (quotation omitted).

A state court determines a petitioner's federal claim "on the merits" and triggers the highly-

deferential AEDPA standard of review when the state court "(1) disposes of the claim 'on the

merits,' and (2) reduces its disposition to judgment." *Sellan*, 261 F.3d at 312 (quotation omitted).

In this regard, it is not necessary for the state court to refer explicitly to the particular federal claim

or to relevant federal case law. *See id.*

If, however, a state court does not adjudicate a petitioner's federal claim "on the merits,"

the state-court's decision is not entitled to AEDPA deference; and, instead, the federal habeas

court must apply the pre-AEDPA standard of *de novo* review to the state-court's disposition of the

federal claim. *See Cotto v. Herbert*, 331 F.3d 217, 230 (2d Cir. 2003) (quoting *Aparicio v. Artuz*,

269 F.3d 78, 93 (2d Cir. 2001)).

**B.**    **Petitioner's ineffective assistance of counsel claims[4]**

Petitioner claims that he received ineffective assistance of both trial and appellate counsel.

Petitioner claims that his trial counsel was ineffective for failing to investigate adequately prior to

trial and for failing to "consult with a medical expert on the physical evidence from [the] rape and

ha[ve] the expert testif[y] as to the lack of physical evidence conducive to rape." *See* Dkt. No. 1-2

---

[4] Respondent concedes that the petition is timely and that petitioner has exhausted all
claims currently before the Court. *See* Dkt. No. 10 at 12-15.

at 6.  Petitioner argues that this failure deprived him the opportunity to attack the credibility of the prosecution's expert.  *See id.* at 8.  Moreover, he argues that this failure cannot be attributed to trial strategy and that a medical expert was necessary in light of the fact that petitioner's conviction was based on merely circumstantial evidence of rape, which was primarily provided by the prosecution's expert.  *See id.* at 8-9.  Finally, petitioner argues that he received ineffective assistance of appellate counsel in that his appellate counsel failed to argue that his trial counsel was ineffective for failing to impeach E.M. with the 911 tape and for failing to consult with a medical expert.

Respondent claims that the motion court found petitioner's ineffective assistance of trial counsel claim to be procedurally barred and, therefore, it is procedurally barred from habeas corpus review.  *See* Dkt. No. 10 at 17-19.  Even if the Court finds that petitioner's ineffective assistance of trial counsel claim it is not procedurally barred, respondent argues that the claim is nevertheless without merit.  *See id.* at 19-26.

### 1. Independent and adequate state grounds

Under the independent and adequate state grounds doctrine, the Supreme Court "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (citations omitted).  "This rule applies whether the state law ground is substantive or procedural."  *Id.* (citations omitted).  Although the independent and adequate state grounds doctrine first arose in the context of direct appeals to the Supreme Court from state-court judgments, the Supreme Court has also applied it "in deciding whether federal district courts should address the claims of state prisoners in habeas

corpus actions." *Lee v. Kemna*, 534 U.S. 362, 375 (2002) (quoting *Coleman*, 501 U.S. at 729, 111
S. Ct. 2546).  In the habeas context, however, the doctrine is prudential rather than jurisdictional.
*See Lambrix v. Singletary*, 520 U.S. 518, 522-23 (1997); *Coleman*, 501 U.S. at 730 (1991);
*Spence v. Superintendent, Great Meadow Corr. Facility*, 219 F.3d 162, 170 (2d Cir. 2000)
(holding that "[t]he doctrine of procedural default is based on considerations of comity and
finality, and not on a jurisdictional limitation on the power of a federal court under 28 U.S.C. §
2254 to look beyond a state procedural default and consider the merits of a defaulted claim that
asserts a constitutional violation" (citations omitted)).

     Under the independent and adequate state grounds doctrine, this Court is generally
procedurally barred from considering a ruling that "fairly appear[s] to rest primarily on state
procedural law." *Jimenez v. Walker*, 458 F.3d 130, 138 (2d Cir. 2006) (citation omitted).  Even
where the state court has ruled on the merits of a federal claim "in the alternative," federal habeas
review is foreclosed where the state court has also expressly relied on the petitioner's procedural
default.  *See Green v. Travis*, 414 F.3d 288, 294 (2d Cir. 2005) (citation omitted).  To bar federal
habeas review, however, the state court's decision must rest not only on an independent procedural
bar under state law, but also on one that is "adequate to support the judgment." *Jimenez*, 458 F.3d
at 138.

     A state procedural bar is "adequate" if it "is firmly established and regularly followed by
the state in question" in the specific circumstances presented in the case currently before the court.
*See Monroe v. Kuhlman*, 433 F.3d 236, 241 (2d Cir. 2006) (citation omitted).  The "guideposts"
for analyzing the issue of adequacy, articulated in the context of a procedural default occurring at
trial, are:

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

*Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir.2 003) (citation omitted).  The *Cotto* guideposts also apply to testing the adequacy of a procedural default raised in a state collateral proceeding.  *See, e.g., Clark v. Perez*, 510 F.3d 382, 391 (2d Cir. 2008) (citation omitted).  In light of comity concerns, a decision that a state procedural rule is inadequate should not be made "lightly or without clear support in state law."  *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (citation omitted).

In the present matter, petitioner's motion to vacate judgment was denied by the Ulster County Court pursuant to New York Criminal Procedure Law § 440.10(2)(c).  *See* Dkt. No. 1 at Exhibit "C."  Specifically, finding petitioner's claim to be procedurally barred, the county court held that, "[a]lthough sufficient facts appeared on the record to have permitted adequate review of the defendant's present claim, the defendant unjustifiably failed to make the argument of ineffective assistance of counsel on his aforesaid appeal (CPL § 440.10(2)(c))."  *Id.* at Exhibit "C," at 2.

The Second Circuit has made clear that a denial of a section 440.10 motion for failure to raise a claim on direct appeal constitutes an "independent and adequate" state procedural ground, which, therefore, bars federal habeas review of a petitioner's claims.  *See Sweet v. Bennett*, 353 F.3d 135, 140-41 (2d Cir. 2003) (finding that the petitioner's ineffective assistance claim was "well-established in the trial record" and could have been brought on direct appeal; and, therefore,

section 440.10(2)(c) was an adequate and independent state-law ground that barred federal habeas review); *Aparicio v. Artuz*, 269 F.3d 78, 93 (2d Cir. 2001) (holding that "there can be no doubt that the state court's decision on Petitioner's trial counsel claim rested on an adequate and independent state bar: Aparicio never raised ineffective assistance of trial counsel in his direct appeal. . . . [and] New York law prohibits review of a claim on collateral review when the defendant unjustifiably fails to raise the claim on direct appeal.  N.Y. Crim. Proc. L. § 440.10(2)(c)"); *Levine v. Comm'r of Corr. Servs.*, 44 F.3d 121, 126 (2d Cir. 1995) (holding that federal habeas review is unavailable where the state court found the claim to be procedurally barred under pursuant to section 440.10(2)(c)); *see also Batchilly v. Nance*, No. 08 Civ. 7150, 2010 WL 1253921, *32 & n.22 (S.D.N.Y. Apr. 2, 2010) (citing cases).

Based on the foregoing, the Court finds that petitioner's ineffective assistance of trial counsel claim was denied on an independent and adequate state-law ground.[5]  Since petitioner no longer has any state-court remedy available, these claims are deemed exhausted and procedurally barred from review in this habeas proceeding.  *See Coleman*, 501 U.S. at 732 (citations omitted). To overcome a procedural bar, a petitioner must demonstrate either cause for the default and actual prejudice resulting therefrom, or that the failure to consider the claims will result in a fundamental miscarriage of justice.  *See id.* at 749-50 (citing *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986)).  To prove a fundamental miscarriage of justice, a petitioner must show that a

---

[5] The Second Circuit has held that "[t]he principle barring habeas review of procedurally forfeited claims is 'relaxed when the state courts themselves have disregarded the default and decided the constitutional claim on the merits.'" *Reyes v. Keane*, 118 F.3d 136, 138 (2d Cir. 1997) (quoting *Roman v. Abrams*, 822 F.2d 214, 222 (2d Cir. 1987)).  In the present matter, the state court did not address petitioner's claim on the merits which strengthens this Court's conclusion that petitioner procedurally defaulted his ineffective assistance of trial counsel claim.

constitutional violation probably resulted in his conviction despite his actual innocence.  *See*

*Schlup v. Delo*, 513 U.S. 298, 321-25 (1995); *Murray*, 477 U.S. at 496.

Petitioner asserts that he has established cause for the default and that prejudice resulted

therefrom.  *See* Dkt. No. 13 at 4.  Petitioner claims that he had cause for the default because he

"could not have raised the issues of ineffective assistance of counsel in his direct appeal because

the evidence used to support this claim was not a part of the record reviewable on direct appeal."

*See id.*  Contrary to petitioner's assertions, the fact that his attorney did not call a medical expert to

rebut the prosecution's medical evidence was available to him on direct appeal and no hearing was

required to determine whether this decision was part of a trial strategy.  *See id.* at 12.  Therefore,

he has failed to establish "cause" for this default.  As recognized by the state court, petitioner

unjustifiably failed to raise this claim on direct appeal because all of the facts necessary for the

claim were available when he brought his direct appeal.  Although petitioner correctly cites *Sweet*

*v. Bennet* for the proposition that some claims of ineffective assistance are "'not demonstrable on

the main record,'" and are therefore more appropriate for collateral review, petitioner's claims do

not fall within this category.  *See* Dkt. No. 13 at 8 (quotation omitted).

Moreover, as will be discussed, petitioner has not established cause or prejudice through

his appellate counsel failure to raise this claim on direct appeal or that a constitutional violation

probably resulted in his conviction despite his actual innocence.  As such, the Court finds that

petitioner's ineffective assistance of trial counsel claim is procedurally barred from habeas review

and, therefore, denies this claim.  In an abundance of caution, however, the Court will address the

merits of petitioner's claim.

### 2. Petitioner received the effective assistance of trial counsel[6]

Under the standard that the Supreme Court promulgated in *Strickland v. Washington*, 466 U.S. 688 (1984), a defendant is required to demonstrate two elements in order to state a successful claim for ineffective assistance of counsel: that (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694.  The habeas petitioner bears the burden of establishing both deficient performance and prejudice. *See United States v. Birkin*, 366 F.3d 95, 100 (2d Cir. 2004) (citation omitted).

The *Strickland* test with regard to counsel's performance is an objective one, which must take into account all of the circumstances of the case facing trial counsel at the time of his or her representation. *See Rompilla v. Beard*, 545 U.S. 374, 394 (2005) (holding that *Strickland* requires attorneys to behave "reasonab[ly] considering all the circumstances"); *accord Wood v. Allen*, ___U.S. ___, 130 S. Ct. 841, 851 (2010) (holding that counsel's decision must be a "reasonable exercise of professional judgment" to comply with *Strickland*).

"[S]trategic choices made by counsel after thorough investigation . . . are virtually unchallengeable," *Strickland*, 466 U.S. at 690-91; and, although there is a strong presumption that counsel's performance falls "within the wide range of reasonable professional assistance," *id.* at 689–90, counsel nevertheless "has a duty to make reasonable investigations, and a decision not to investigate will be reasonable only 'to the extent that reasonable professional judgments support the limitations on investigation,'" *Gersten v. Senkowski*, 426 F.3d 588, 607 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690–91, 104 S. Ct. 2052); *see also Bell v. Cone*, 535 U.S. 685, 698 (2002).

---

[6] Since the state court did not address this claim on the merits, the Court will review this claim *de novo*, as opposed to "the deferential review prescribed by AEDPA for an 'adjudication on the merits[.]'" *Jelinek v. Costello*, 247 F. Supp. 2d 212, 283 (E.D.N.Y. 2003).

Stated another way, trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.

"In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003). Where counsel fails to make a reasonable investigation that is reasonably necessary to the defense, a court will usually conclude that the decision not to call an expert cannot have been based on strategic considerations and will thus be subject to review under *Strickland's* prejudice prong. *See Pavel v. Hollins*, 261 F.3d 210, 223 (2d Cir. 2001) (finding that trial counsel was ineffective in a child sexual abuse case where his failure to call a medical expert was based on an insufficient investigation) (citation omitted); *Lindstadt v. Keane*, 239 F.3d 191, 201 (2d Cir. 2001) (holding that "defense counsel's failure to consult an expert, failure to conduct any relevant research, and failure even to request copies of the underlying studies relied on by [the prosecution's medical expert] contributed significantly to his ineffectiveness" (citations omitted)).

In evaluating prejudice, the reviewing court must "look to the cumulative effect of all of counsel's unprofessional errors." *Gersten v. Senkowski*, 426 F.3d 558, 611 (2d Cir. 2005) (citing *Lindstadt*, 239 F.3d at 204) (holding that "[w]e need not decide whether one or another or less than all of these four errors would suffice, because *Strickland* directs us to look at the totality of the evidence before the judge or jury, 'keeping in mind that '[s]ome errors [ ] have . . . a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture. . . .' We therefore consider these errors in the aggregate" (quotation and other citations omitted)).

The Second Circuit has acknowledged that there is no *per se* rule that requires trial attorneys to seek out an expert witnesses and that expert consultation is not always necessary in order to provide effective assistance of counsel in sexual abuse cases. However, "[i]n sexual abuse cases, because of the centrality of medical testimony, the failure to consult with or call a medical expert is often indicative of ineffective assistance of counsel." *Gersten*, 426 F.3d at 607 (citing *Eze v. Senkowski*, 321 F.3d 110, 127–28 (2d Cir. 2003); *Pavel v. Hollins*, 261 F.3d 210, 224 (2d Cir. 2001); *Lindstadt v. Keane*, 239 F.3d 191, 201 (2d Cir. 2001)). "This is particularly so," the *Gersten* panel explained, "where the prosecution's case, beyond the purported medical evidence of abuse, rests on the credibility of the alleged victim, as opposed to direct physical evidence such as DNA, or third party eyewitness testimony." *Gersten*, 426 F.3d at 607 (citing *Eze*, 321 F.3d at 128; *Pavel*, 261 F.3d at 224).

In the present matter, trial counsel's overall performance was effective. In his opening statement, petitioner's counsel admitted that petitioner was in E.M.'s bedroom, but put forth the defense's theory that petitioner was heavily intoxicated, on drugs, and did not have the mental capacity to forcibly rape E.M. *See* Tr. at 170-72. He also asked the jury to pay close attention to E.M.'s testimony and speculated that E.M. would not testify that petitioner penetrated her vagina with his penis, which she did not. *See id.* at 174-76. Further, counsel discussed Ms. Nerone's report and pointed out that the report fails to indicate whether a rape actually occurred. *See id.* at 174-75.

At trial, counsel extensively cross-examined the prosecution witnesses and made numerous objections. Petitioner's counsel presented petitioner's testimony that, on the night of the attack, he had gotten into a fight with this girlfriend, that he had taken drugs and alcohol, and that he was looking for his girlfriend who lived across the street from the victim. Petitioner also

testified that, although he broke into E.M.'s house, took off his pants, and got into her bed, he did not rape her. *See id.* at 538-55.

With respect to petitioner's claim that trial counsel was ineffective for failing to consult with a medical expert, his claim is without merit. *See* Dkt. No. 1-2 at 6-8. Petitioner alleges that, had trial counsel performed an adequate pretrial investigation, "he would have been able to consult with a medical expert on the physical evidence from rape and had the expert testif[y] as to the lack of physical evidence conducive to rape." *See id.* at 6.

On direct examination, Ms. Nerone, the prosecution's medical expert, observed two actively bleeding sources on E.M. "One was at the bottom of the vaginal opening, at the bottom of the introitus," and another was a tear approximately one inch inside the vaginal opening. *See* Tr. at 464-65. She asserted that the tear "extend[ed] from the outer edge, actually from the fossa navicularis posterior fourchet area in through what's known as the hymenal ring." *See id.* at 466. Ms. Nerone testified that this finding was significant because "once an object passes the hymenal ring, it is then within the plane of the body, it is inside." *See id.* at 467. When the prosecution asked Ms. Nerone whether the "findings in connection with your examination of this victim [indicate that] penetration has occurred," petitioner's counsel objected and persuaded the court that the question called for an improper conclusion from the witness. *See id.* at 471-74. Thereafter, the prosecution had Ms. Nerone read into the record the form that she filled out while performing her examination on E.M. on the day of the incident. *See id.* at 481-88.

On cross-examination, petitioner's counsel called into question Ms. Nerone's credibility and the credibility of the forms that she used in performing her examination by establishing that the forms used were provided by the Ulster County District Attorneys Office and that Ms. Nerone was, in fact, employed by the district attorneys office. *See id.* at 489-90. Moreover, petitioner's

counsel established that Ms. Nerone did not note any bruises, abrasions, cuts, or marks of any

kind on E.M.'s body, except for those found in an around the genital area.  *See id.* at 491-92.

Also, petitioner's counsel had Ms. Nerone reiterate that the form stated that E.M. did not

suffer a "lapse of consciousness" during the alleged incident in her report.  *See id.* at 494.  This

fact directly contradicted E.M.'s trial testimony in which she repeatedly stated that she "blanked

out" during the alleged incident.  Thereafter, petitioner's counsel established that the navicularis

and the "fossa navicularis" are "not a part of the vagina."  *See id.* at 494-95.  This line of questions

made clear that, although the form indicated that petitioner "rubbed against navicularis and

fourchet," such conduct does not constitute penetration for purposes of New York's rape statute.

*See id.*

Counsel also established that E.M. suffered from hemorrhoids at the time of the incident

and questioned Ms. Nerone about the fact that she did not perform a rectal swab during the

examination.  *See id.* at 499.  This allowed petitioner's counsel to put forth an alternative

explanation as to why there was blood present in petitioner's undergarments at the time of the

examination.  *See id.* at 510.

Petitioner's counsel also questioned Ms. Nerone about the effects of menopause on women

and the fact that it causes a decrease in estrogen levels, which can lead to a thinning of the vaginal

lining, a loss of elasticity of the skin in the vaginal walls, dryness, and fissures, "which are breaks

or cracks in the vaginal wall."  *See id.* at 500-01.  Further, petitioner's counsel had Ms. Nerone

establish that "dermatitis or diaper rash" is a condition that "[w]ould cause a red irritation of the

external genitalia of a person who was wearing Depends on a regular basis[.]"  *See id.* at 502.  She

further admitted that E.M. was wearing Depends at the time of the examination.  *See id.*

Moreover, Ms. Nerone admitted that she did not ask E.M. whether she was suffering from any of

these conditions prior to the alleged incident.  *See id.* at 503.  Significantly, petitioner's counsel

elicited from Ms. Nerone that E.M.'s vaginal walls could have been torn from something "other

than penetration by a penis," including "[b]lunt force trauma, fingernails, objects."  *See id.* at 503-

04.

   The above makes clear that petitioner's trial counsel provided effective assistance.  It is

evident from the record that petitioner's trial counsel possessed information regarding the victim's

prior existing medical conditions, the expert's report, and was able to effectively utilize that

information in support of petitioner's defense.  Contrary to petitioner's assertions, his trial

counsel's performance makes clear that he thoroughly investigated the record in this case and was

well-versed in all pertinent subject matter.  Unlike the cases that petitioner's relies upon in his

supporting memoranda, trial counsel in this case was not unfamiliar with the medical lexicon

contained in the victim's records, nor was this a scenario where prosecution introduced expert

testimony which necessitated rebuttal.  *Cf. Gersten*, 426 F.3d at 608-09; *Lindstadt*, 239 F.3d at

203; *Pavel*, 261 F.3d at 218 (cases finding that trial counsel was ineffective for, among other

things, failing to consult medical experts in order to counter the prosecution's expert testimony

regarding physical conditions indicative of sexual abuse).  Notably, *Lindstadt, Pavel*, and *Gersten*

were cases where the attorney's failure to call a medical expert was compounded by other errors

committed and where the cumulative effect amounted to ineffective assistance.  *See Pavel*, 261

F.3d at 218 (attorney labored under the assumption that the charges would be dismissed and did

not prepare a defense; decision not to call expert witnesses was related to the goal of merely

"avoiding work"); *Lindstadt*, 239 F.3d at 203 (finding ineffective assistance where counsel failed

to discover and expose that daughter gave wrong date for alleged abuse, failed to request unnamed

studies relied on by prosecution's expert, stated in opening that defendant would only testify if

prosecution proved its case, and failed to argue the relevance of third-party testimony that defendant's wife tried to get him arrested before the alleged abuse was reported); *Gersten*, 426 F.3d at 608-09.[7]  Such cumulative error is hardly present on this record.

Finally, petitioner fails to provide any support for his contention that trial counsel would have been able to obtain a medical expert to refute or undermine the prosecution expert's credibility.  Such speculation is insufficient to establish that, but for this omission, the result of

---

[7] The present matter is distinguishable from the cases on which petitioner relies. Particularly, in *Gersten*, the Second Circuit observed,

> that medical expert consultation or testimony is particularly critical to an effective defense in sexual abuse cases where direct evidence is limited to the victim's testimony. . . .  The situation may be different in a case where objective evidence exists implicating petitioner in a crime, such as bodily fluids identified as the petitioner's, or where the prosecution offered third party eyewitness testimony.  But in a case where the only direct evidence that any crime occurred or that, if it did, the petitioner committed it, was the testimony of the alleged victim, for defense counsel to simply concede the medical evidence without any investigation into whether it could be challenged was performance that the state court could not reasonably find to be objectively reasonable.

*Gersten*, 426 F.3d at 608 (internal citations omitted).  The court also found "[p]articularly troubling . . . counsel's failure to examine" the relevant medical evidence prior to trial.  *See id.* at 609.  The court found that this failure to investigate was a "serious dereliction of his duty," and that counsel's failure to consult with or call a medical expert could not be attributed to a reasonable trial strategy because "no facts [were] known to defense counsel at the time that he adopted a trial strategy[.]" *Id.*

In the present matter, the prosecution's case was not built solely on the victim's testimony. In fact, petitioner admitted to most of the alleged conduct, but merely denies that penetration occurred.  Moreover, as discussed, the prosecution's medical expert testified that E.M.'s vaginal tear and bleeding were consistent with ""some sort of penetration," not that they were necessarily from intercourse.  *See* Tr. at 474.  Further, petitioner admitted to most of the conduct at issue, but relied on an implausible defense that the jury chose to ignore.  Finally, unlike counsel in *Gersten*, petitioner's counsel was clearly well-prepared for trial and was well-versed in the relevant medical evidence and terminology, and effectively cross-examined the prosecution's witnesses.

23

the proceeding would have been different. *See, e.g., Reid v. Giambruno*, No. 03-CV-0250, 2007 WL 3232497, *11 (W.D.N.Y. Oct. 31, 2007) (citation omitted).

Petitioner also argues that his trial counsel provided ineffective assistance in failing to call an expert to refute the testimony of the prosecution's DNA expert, Dr. Russell Gettig. *See* Dkt. No. 1-2 at 15. Dr. Gettig testified that petitioner's DNA was found in E.M.'s bed and that a mix of both of their DNA was found on the front of petitioner's waistband. *See* Tr. at 317. Petitioner, however, admitted to laying in bed with E.M., on top of her, with his pants off; all of which would have left traces of petitioner's DNA at the scene. Moreover, on cross-examination, petitioner's counsel had Dr. Gettig admit that he was unable to identify the source of the DNA mix found on petitioner's waistband. *See id.* Petitioner's counsel had Dr. Gettig make clear that this DNA mix could have come from "lots of things," including urine, but not necessarily semen. *See id.* Again, petitioner does not make clear what such an expert would have provided to his defense and certainly does not raise any doubts that the result of the proceeding would have been different had petitioner's trial counsel consulted his own expert to contradict the DNA evidence provided.

Based on the foregoing, the Court finds that petitioner received the effective assistance of trial counsel.

### 3. Petitioner's ineffective assistance of appellate counsel claim

Petitioner asserts that his appellate counsel was ineffective for failing to argue that trial counsel was ineffective for failing to (1) impeach E.M.'s testimony with the recording of her 911 telephone call and (2) consult with a medical expert. *See* Dkt. No. 1-2 at 13-18. Respondent contends that this claim must fail because "'the underlying claims of ineffective assistance of trial counsel are themselves meritless.'" *See* Dkt. No. 10 at 27 (quotation omitted). Moreover,

24

respondent claims that, even if it was unreasonable for trial counsel to fail to cross-examine E.M.

regarding her 911 call, appellate counsel was not ineffective for failing to raise the issue on appeal

because the evidence that petitioner committed the rape was strong; and, therefore, no prejudice

ensued.  *See id.* at 28-29.

 As stated, "[u]nder the Antiterrorism and Effective Death Penalty Act of 1996 ('AEDPA'),

28 U.S.C. § 2254(d)(1), a federal court may not grant a state prisoner's habeas application unless

the relevant state-court decision 'was contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States.'"

*Gueits v. Kirkpatrick*, 612 F.3d 118, 122 (2d Cir. 2010) (quoting *Knowles v. Mirzayance*, --- U.S.

---, ---, 129 S. Ct. 1411, 1418, 173 L. Ed. 2d 251 (2009)).  "Where, as here, 'a state court fails to

articulate the rationale underlying its rejection of a petitioner's claim, and when that rejection is on

the merits, the federal court will focus its review on whether the state court's ultimate decision

was an unreasonable application of clearly established Supreme Court precedent.'" *Id.* (quotation

omitted).[8]

 The same *Strickland* standard applies when determining whether appellate counsel on

direct appeal has provided constitutionally effective assistance.  *See Aparicio v. Artuz*, 269 F.3d

78, 95 (2d Cir. 2001) (holding that "[a]lthough it was born in the context of ineffective assistance

of trial counsel, *Strickland 's* two-prong test applies equally to claims of ineffective assistance of

appellate counsel on a defendant's first appeal as of right" (citing *Evitts v. Lucey*, 469 U.S. 387,

396–97, 105 S. Ct. 830, 83 L. Ed. 2d 821 (1985)).  To provide effective assistance, an attorney

need not bring every potential non-frivolous claim to meet the performance prong.  Rather,

---

 [8] The appellate division provided no rationale as to why it denied petitioner's ineffective
assistance of appellate counsel claim.

appellate counsel may appropriately "select from among" potential non-frivolous claims "to maximize the likelihood of success of appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (citing *Jones v. Barnes*, 463 U.S. 745, 750–54, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983)).  Indeed, "[t]his process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quotation omitted).

To establish prejudice "in the appellate context, a petitioner must demonstrate that 'there was a "reasonable probability" that [his] claim would have been successful before the [state's highest court].'" *Mayo v. Henderson*, 13 F.3d 528, 534 (2d Cir. 1994) (quoting *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992)).  That is, the petitioner has to show that there is a reasonable probability that he would have been successful in his appeal had the claim been raised.  *See Gaskin v. Graham*, No. 08-CV-1124, 2009 WL 5214498, *17 (E.D.N.Y. Dec. 30, 2009) (citing *Mayo*, 13 F.3d at 533–34; *Aparicio*, 269 F.3d at 95).

Contrary to petitioner's assertions, his appellate counsel provided effective assistance. Petitioner's appellate counsel submitted a twenty-eight page memorandum of law in which she made abundant citations to the record and relevant case law.  *See* Dkt. No. 9 at Exhibit "A."  In her memorandum of law, counsel raised three arguments: (1) the evidence was legally insufficient to support the conviction; (2) the prosecutor failed to turn over a statement that petitioner made to police and then improperly elicited the statement at trial; and (3) the sentence was harsh and excessive.  *See id.*  All three arguments were viable issues for counsel to raise; and, in fact, petitioner raises two of them in the present petition.

Moreover, as explained above, petitioner's trial counsel was not ineffective for failing to call a medical expert and, therefore, petitioner's ineffective assistance of appellate counsel claim

must fail insofar as he alleges that his appellate counsel was ineffective for failing to raise this argument on appeal. *See Rolling v. Fischer*, 433 F. Supp. 2d 336, 351 (S.D.N.Y. 2006) (holding that "there can be no claim of ineffective assistance of appellate counsel where the underlying claims of ineffective assistance of trial counsel are themselves meritless" (citations omitted)). Even if it was error for petitioner's trial counsel to fail to call a medical expert, petitioner's appellate counsel was not ineffective for failing to raise the issue on appeal. As respondent correctly notes, New York State courts have found that a defendant's speculation as to how an expert witness would have testified "provides no basis to conclude that defendant had less than competent legal counsel." *People v. Ahl*, 243 A.D.2d 985 (3d Dep't 1997). Moreover, "it is difficult to obtain reversal of a New York conviction on appeal based on trial counsel's failure to call an expert witness, especially when the proposed expert testimony is only speculative." *Reid*, 2007 WL 3232497, at *12 (citing *People v. Hobot*, 84 N.Y.2d 1021, 1024 (1995)) (other citation omitted). As such, appellate counsel's decision to omit this argument from her brief cannot be attributed to ineffective assistance, but, more likely, a conscious decision to focus on other arguments that were more likely to succeed on appeal. *See Smith*, 477 U.S. at 536 (quotation omitted).

Next, petitioner argues that his appellate counsel was ineffective for failing to argue that trial counsel was ineffective for not impeaching E.M.'s testimony with the 911 tape. Petitioner claims that E.M. told the 911 operator that "a white male 'got on top of her, but no rape occurred.'" *See* Dkt. No. 1-2 at 14. With respect to the 911 tape, petitioner's trial counsel attempted to have a written record of the call, prepared by the 911 operator for use by the police, admitted into evidence. The court rejected counsel's request because "there [was] no indication that [the record]

was even remotely reliable." *See* Tr. at 532-33, 555-56.  Moreover, the court rejected counsel's request to recall E.M. to cross-examine her regarding her call to 911.  *See id.* at 555-56.

Even assuming that it was error for petitioner's trial counsel to fail to cross-examine E.M. regarding her conversation with the 911 operator, appellate counsel was not ineffective for failing to raise this claim on appeal.  E.M. testified at trial that she "blanked out" and, therefore, had no recollection of whether penetration actually occurred.  Moreover, the evidence supporting the fact penetration occurred was strong.  Specifically, E.M. testified that she remembered trying to prevent petitioner from penetrating her vagina and mouth with her hands, but "blanked out" at several times and does not recall what happened during those periods.  Additionally, E.M. stated that she felt soreness in the area of her vagina after the attack.  Finally, the medical evidence also supported the fact that penetration occurred, which established that E.M. had a tear that "extend[ed] from the outer edge, actually from the fossa navicularis posterior fourchet area in through what's known as the hymenal ring."  *See* Tr. at 466.  As such, there is no reason to believe that impeaching E.M. with the 911 tape would have changed the outcome of the trial.  *See Dunham v. Travis*, 313 F.3d 724,732 (2d Cir. 2002); *see also Lynn v. Bliden*, 443 F.3d 238, 245-46 (2d Cir. 2006) (holding that defense counsel's failure to impeach an identification witness with a prior inconsistent statement that he "couldn't recognize" the perpetrator did not constitute deficient performance under *Strickland*); *Strickland*, 466 U.S. at 695 (holding that "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury").

Based on the foregoing, the Court finds that the state-court's decision that petitioner's appellate counsel provided effective assistance was not contrary to or an unreasonable application of clearly-established federal law.

**C.      Petitioner's weight and sufficiency of the evidence claims**

Petitioner asserts that he was denied his constitutional right to a fair trial because the verdict for Rape in the First Degree was against the weight and sufficiency of the evidence. *See* Dkt. No. 1-2 at 18-21. Specifically, petitioner argues that there was insufficient evidence to establish that penetration occurred. *See id.*

In his direct appeal, the appellate division noted that "the elderly victim candidly testified that she 'blanked out' during certain portions of the assault." *Jacobs*, 37 A.D.3d at 869. The appellate division also found that E.M.'s testimony established that

> defendant's exposed penis was "in the area of" her vagina as he lay
> on top of her, that she tried to prevent it from entering her and that
> she then "blocked everything out." It was further established by the
> victim that defendant's penis was thereafter near her mouth as he
> "went up higher on [her]," at which point she "went blank again."
> Although the victim did not recall actual penetration, she testified
> that she was sore in her "private area" following the attack.

*Id.* Thereafter, the court noted that the certified forensic nurse established that E.M.'s injuries following the attack were consistent with penetration and that there was proof that biological fluid was found on petitioner's shorts that contained both petitioner's and E.M.'s DNA and that petitioner's DNA was found on E.M.'s bed sheet. *See id.* As such, the appellate division found that, "[v]iewing this evidence in a light most favorable to the People, there was indeed a valid line of reasoning and permissible inferences which could lead to the conclusion reached by the jury, namely, that defendant raped the victim that morning . . . and also intended to place his penis into her mouth and came dangerously close to doing so. . . ." *Id.* at 869-70 (internal citations omitted). The court similarly rejected petitioner's claims regarding his convictions on the remaining two counts. *See id.* at 870.

Review of a conviction as against the "weight of the evidence" is a product of New York

state statute and, therefore, merely a state-law issue. *See* N.Y. Crim. Proc. Law § 470.15; *Ward v.*

*Herbert*, 509 F. Supp. 2d 253, 264 & n.3 (W.D.N.Y. 2007) (citations omitted). Since federal

habeas corpus review is not available to remedy mere errors of state law, *see Estelle*, 502 U.S. at

67-69, no cognizable federal issue is presented by a habeas claim challenging the weight of the

evidence adduced at trial, *see Ward*, 509 F. Supp. 2d at 264 & n.3 (citations omitted). A

challenge to the sufficiency of the evidence, however, is amenable to federal habeas review. *See*

*Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) (citing *Quirama v. Michele*, 983 F.2d 12,

14 (2d Cir. 1993)).

To analyze the sufficiency of the evidence of a state conviction, "'[a] federal court must

look to state law to determine the elements of the crime.'" *Id.* (quotation omitted). A habeas

petition challenging the evidentiary sufficiency of a state-court conviction fails if "*any* rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This standard places a "'heavy burden'" on a

habeas petitioner. *See United States v. Parkes*, 497 F.3d 220, 225 (2d Cir. 2007) (quotation and

other citations omitted).

### 1. Rape in the First Degree

To convict a defendant of rape in the first degree, the prosecution must prove that the

defendant engaged in sexual intercourse with the victim by forcible compulsion. *See* N.Y. Penal

Law § 130.35(1). "Forcible compulsion" is defined, in part, as compelling another "by either . . .

use of physical force; or . . . a threat, express or implied, which places a person in fear of

immediate death or physical injury to himself, herself or another person." *See* N.Y. Penal Law §

130.00(8).  Finally, "sexual intercourse" "has its ordinary meaning and occurs upon any penetration, however slight."  N.Y. Penal Law § 130.00(1).

In the present matter, the evidence at trial was clearly sufficient to establish beyond a reasonable doubt all of the elements necessary to support a first degree rape conviction.  "It is well settled that sexual intercourse can be established by medical evidence where the victim is unable to testify as to penetration."  *People v. Fuller*, 50 A.D.3d 1171, 1173 (3d Dep't 2008) (citing *People v. Carroll*, 95 N.Y.2d 375, 383 (2000); *People v. Dunn*, 204 A.D.2d 919, 920 (1994), *lv denied* 84 N.Y.2d 907 (1994).  Ms. Nerone testified that there was active bleeding from two sources in E.M.'s vaginal area; a tear at the bottom of E.M.'s vaginal opening that was oozing blood, and another bleeding abrasion that was approximately one inch inside her vaginal opening. *See* Tr. at 464-66.  Moreover, both on direct and cross-examination, Ms. Nerone made clear that such injuries were likely due to "some form of penetration."  *See id.* at 473-74, 494, 504.  Ms. Nerone's testimony, in addition to E.M.'s testimony that she experienced soreness in her vagina that she had not felt before her encounter with petitioner, *see* Tr. at 203-05, and petitioner's recollection of the incident, was sufficient to support the jury's determination that "penetration, however slight," had occurred.

As such, the Court finds that the state-court's decision that petitioner's conviction for Rape in the First Degree was supported by sufficient evidence was not contrary to or an unreasonable application of clearly-established federal law.[9]

---

[9] Although petitioner asserts in the section heading of his reply memorandum that "there was insufficient evidence to convict him of all charges beyond a reasonable doubt," petitioner fails to provide any arguments in support of his contention that there was insufficient evidence to support his convictions for Attempted Criminal Sexual Act in the First Degree and Burglary in the Second Degree.  Considering his *pro se* status, however, the Court will address the sufficiency of the evidence for each of these convictions.

### *2. Attempted Criminal Sexual Act in the First Degree*

"A person is guilty of criminal sexual act in the first degree when he or she engages in oral sexual conduct . . . with another person . . . by forcible compulsion[.]"  N.Y. Penal Law § 130.50(1).  Pursuant to New York Penal Law § 110.00, "[a] person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime."   The New York State Court of Appeals has "construed this provision as requiring proof that defendant engaged in conduct that came 'dangerously near' commission of the completed crime."  *People v. Kassebaum*, 95 N.Y.2d 611, 618 (2001) (quotation and other citation omitted).  As such, reading these statutes in tandem, the prosecution was required to establish that petitioner intended to engage in oral sexual conduct with E.M. by forcible compulsion, and that he engaged in conduct that came "'dangerously near'" to accomplishing this objective.

The evidence at trial established that petitioner was naked from the waste down, laid on top of E.M., kissed and caressed various parts of E.M.'s body, and eventually moved farther up her body and placed his penis "[b]y her mouth." *See* Tr. at 199.  E.M., however, could not remember if petitioner actually placed his penis in her mouth because she once again "blanked out." *See id.* Moreover, E.M. testified that, while this incident was occurring, she

> kept saying, I don't know who this is, I don't want him to hurt me, I didn't know what he was carrying, if he had a knife or gun or what, and I didn't want to die.  So I figured I won't fight with him, I'll just – I just wanted to get him out.  And I asked him to please leave because I didn't know – I asked him what his name was, I asked him what he wanted and I said, just go.

*See id.* at 192-93.

E.M.'s testimony clearly provided sufficient evidence for the jury to find petitioner guilty of Attempted Criminal Sexual Act in the First Degree.[10]  Based on the foregoing, the Court finds that the state-court's decision that petitioner's conviction for Attempted Criminal Sexual Act in the First Degree was supported by sufficient evidence and was not contrary to or an unreasonable application of clearly-established federal law.

### 3. Burglary in the Second Degree

"A person is guilty of burglary in the second degree when he knowingly enters or remains unlawfully in a building with intent to commit a crime therein, and when . . . [t]he building is a dwelling."  N.Y. Penal Law § 140.25(2).  "'[I]ntent may be inferred from the circumstances of the intruder's unlawful entry, unexplained presence on the premises, and actions and statements when confronted by the police or the property owner.'" *People v. Sturdevant*, 74 A.D.3d 1491, 1492 (3d Dep't 2010) (quotation omitted).

In the present matter, petitioner admitted that he gained entry into E.M.'s house by using a knife to cut a window screen, and then climbed in through the opening.  *See* Tr. at 549, 564-67.  Thereafter, petitioner proceeded to E.M.'s bedroom, removed his pants, and engaged in the conduct previously described.  Such testimony clearly provided sufficient evidence for a rational jury to find that the prosecution established each of the requisite elements beyond a reasonable

---

[10] Notably, the jury acquitted petitioner on the Criminal Sexual Act in the First Degree count of the indictment.  This result is entirely consistent with the guilty verdict on the Rape in the First Degree count because, although E.M. could not recall whether there was penetration, she was "sore" in her vaginal area following the incident and the medical evidence established that she had physical signs that were consistent with penetration.  However, no such medical or physiological evidence was presented to establish that petitioner actually achieved the criminal sexual act alleged.

doubt.  *See Brown v. Walsh*, No. 9:06-cv-01130, 2009 WL 3165712, *11-*13 (N.D.N.Y. Sept. 28, 2009).

Based on the foregoing, the Court finds that the state-court's decision that petitioner's conviction for Burglary in the Second Degree was supported by sufficient evidence and was not contrary to or an unreasonable application of clearly-established federal law.


**D.      Petitioner's *Brady*[11] claim**

Petitioner claims that he was denied his right to a fair trial because the prosecution failed to disclose a statement that petitioner allegedly made to the police and then elicited that statement on the re-direct examination of the police officer.  *See* Dkt. No. 1-2 at 21-25.  In his habeas petition, petitioner argues that the prosecution violated *People v. Rosario*, 9 N.Y.2d 286, 290-91 (1961) by failing to disclose his statement before trial.  *See* Dkt. No. 9 at Exhibit "A," at 20-24. Moreover, petitioner argues that "his due process was denied when the People failed to turn over the statement as is required by state law (see C.P.L. 240.20(1), C.P.L. 710.30(1), (A)).  It impugned fundamental fairness because it went directly to the heart of the issue concerning guilt or innocence."  *See* Dkt. No. 1-2 at 22.

"Under *Brady* and its progeny, 'the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment.'"  *United States v. Paulino*, 445 F.3d 211, 224 (2d Cir. 2006) (quoting *United States v. Jackson*, 345 F.3d 59, 70 (2d Cir. 2003)).  "To establish a *Brady* violation, a defendant must show (1) that the evidence at issue is 'favorable to [him], either because it is exculpatory', or because it is impeaching; (2) the 'evidence must have been suppressed by the State, either willfully

---

[11] *Brady v. Maryland*, 373 U.S. 83 (1963).

or inadvertently'; and (3) 'prejudice must have ensued.'" *Id.* (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999)).

As the Supreme Court has explained,

> [the materiality analysis] is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995) (footnote omitted). "Materiality is assessed in light of the evidence adduced against the defendant at trial; when a conviction is supported by overwhelming evidence of guilt, habeas relief is not warranted." *Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001) (citations omitted).

In assessing whether a *Brady* violation has occurred, "[e]vidence is not 'suppressed' if the defendant either knew, . . . or should have known, . . . of the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982) (internal citations omitted); *see also United States v. Agurs*, 427 U.S. 97, 103 (1976). The government is not required to disclose evidence to a defendant "who is 'on notice of the essential facts which would enable him to call the witness and thus take advantage of any exculpatory testimony that he might furnish.'" *Id.* (quoting *United States v. Stewart*, 513 F.2d 957, 600 (2d Cir. 1975)). "The rationale underlying *Brady* is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to

assure that the defendant will not be denied access to exculpatory evidence only known to the Government." *Id.* at 619 (citation omitted).

At trial, the prosecution called Officer Restivo, who was one of the officers who arrested petitioner. On re-direct examination, the following colloquy took place:

> Q.    Sir, on cross-examination, you were asked about a
>        conversation with the defendant; is that correct?
>
> A.    Yes, sir.
>
> * * * * *
>
> Q.    What did he say?
>
> A.    He said he was sleeping in his van.
>
> Q.    Anything else in the conversation that you had with him
>        during the time that you were with him?
>
> A.    Yes.  He said he had walked to his van.
>
> Q.    Anything else?
>
> A.    He had said, is it a crime to sleep with your friend.
>
> The Court:    Is it a crime?
>
> The Witness:  To sleep with your – to have sex with your friend.  Excuse
>               me.

*See* Tr. at 350-51.

Thereafter, in response to petitioner's counsel's objection, the court instructed the jury to "disregard the last questions and answers." *Id.* at 352.  Petitioner's counsel then requested a mistrial based on this testimony because it violated New York Criminal Procedure Law § 710.30. *See id.*  The prosecutor stated that he was only made aware of the statement the week prior to the start of trial and that he did not intend to use the statement.  *See id.* at 352-53.  The court reserved

36

decision and, after the verdict, allowed petitioner's counsel an opportunity to submit a memorandum of law in support of his motion. *See id.* at 352-85, 759.

In a written decision dated April 14, 2005, the court denied the mistrial motion, finding, among other things, that the court's curative instruction was sufficient to alleviate any prejudice. *See* Dkt. No. 9 at Exhibit "W." The appellate division upheld the decision, finding that the trial court did not abuse its discretion.

First, petitioner's *Rosario* claim does not present an error of constitutional magnitude and, therefore, is not cognizable on habeas review. *See Landy v. Costello*, 141 F.3d 1151, 1998 WL 105768, *1 (2d Cir. 1998) (holding that "[t]o the extent that this claim is based on a *Rosario* violation, it must fail, because a habeas petition can only be granted to remedy some violation of federal law; the obligation to turn over *Rosario* material arises under state law. Thus, the only question is whether the prosecution violated *Brady*"); *see also Hill v. Senkowski*, 409 F. Supp. 2d 222, 232 (W.D.N.Y. 2006) (citing *Lyon v. Senkowski*, 109 F. Supp. 2d 125, 139 (W.D.N.Y. 2000)); *Sutherland v. Walker*, No. 97 CIV. 4432, 1999 WL 1140870, *9 (S.D.N.Y. Dec.10, 1999). Unlike a *Brady* claim, a *Rosario* claim is solely a right provided by New York state law. *See Lyon v. Senkowski*, 109 F. Supp. 2d 125, 139 (W.D.N.Y. 2000). Second, contrary to petitioner's assertions, no violations of either *Rosario* or *Brady* occurred. As noted in *Harper v. Goord*, No. 06-CV-485, 2009 WL 910341 (E.D.N.Y. Mar. 31, 2009),

> [u]nder *People v. Rosario*, a defendant is entitled to examine a prior statement of a witness called by the prosecution. 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (N.Y. 1961). Here, the prior statement was made by the defendant, not a prosecution witness; thus, *Rosario* does not apply. *Brady v. Maryland*, requires the prosecution to provide any exculpatory material to the defendant where the evidence is material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

> This was not an exculpatory statement, but an inculpatory statement, and so there was no *Brady* violation.

*Id.* at *15.  Aside from the fact that this was an inculpatory statement and, therefore, not within the protections afforded by *Brady*, petitioner made the statement which means that he "either knew, . . . or should have known, . . . of the essential facts permitting him to take advantage of" this evidence.  *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982) (internal citations omitted).

Based on the foregoing, the Court finds that the state-court's decision was not contrary to or an unreasonable application of clearly-established federal law.


**E.       Certificate of appealability**

The Court notes that 28 U.S.C. § 2253(c)(1) provides, in relevant part, that, "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from – (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court[.]"[12]  28 U.S.C. § 2553(c)(1).  A court may only issue a Certificate of Appealability "if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

Since petitioner has failed to make such a showing, the Court declines to issue a Certificate of Appealability in this matter.  *See Hohn v. United States*, 524 U.S. 236, 239-40 (1998) (quotation omitted).

---

[12] Rule 22 of the Federal Rules of Appellate Procedure also provides that an appeal may not proceed in such actions "unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)."  Fed. R. App. P. 22(b)(1).

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that petitioner's petition for a writ of habeas corpus is **DENIED** and **DISMISSED**; and the Court further

**ORDERS** that no Certificate of Appealability shall be issued with respect to any of petitioner's claims.

**IT IS SO ORDERED.**

Dated: June 1, 2011
      Albany, New York

Mae A. D'Agostino
U.S. District Judge